**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **CAIR HEATING AND** | ) | |
| **COOLING, LLC** | ) | |
| | ) | **CASE NO. 23-31622** |
| | ) | |
| **DEBTOR** | ) | **CHAPTER 11** |
| _____ | ) | |

**AGREED ORDER REJECTING LEASE AGREEMENT FOR 13101 DATA**
**VAULT DRIVE AND TERMINATING AUTOMATIC STAY**

Comes now a lease creditor herein, 211 N. English Station, LLC ("211") and the above-styled debtor, Cair Heating and Cooling, LLC ("Debtor"), by their respective counsel, and the parties being in agreement, stipulate as follows:

A.      On August 30, 2022, the Debtor and 211 entered into a lease for the commercial premises located at 13101 Data Vault Drive in Louisville, Kentucky. A true copy of the Lease Agreement is attached as Exhibit A;

B.      The Debtor never took possession of the premises, however, the lease was not terminated prior to the Petition Date of July 14, 2023. In the Debtor's business judgment, it has no use for the leased premises and does not believe assumption and potential assignment of the lease would create any benefit for its estate;

C.      211 has no objection to the Debtor's rejection of the Lease Agreement and desires to facilitate a rejection so the automatic stay can be lifted and 211 can lease the premises to another tenant. 211 agrees it will not assert an administrative expense claim in this case.

The Court having considered the agreement and stipulations of the parties, the record in this case, and being sufficiently advised,

**IT IS HEREBY ORDERED AND ADJUDGED** that:

1.      The lease for the premises at 13101 Data Vault Drive, Louisville, Kentucky is rejected, effective as of the entry of this Order;

2.      The automatic stay afforded by 11 U.S.C. § 362 is hereby terminated, permitting 211 to release the premise located at 13101 Data Vault Drive, Louisville, Kentucky;

3.      211 shall have thirty (30) days after entry of this Order to file a claim for rejection damages, provided that 211 shall not be entitled to any administrative expense claim in connection with the Lease Agreement.

AGREED TO AND PREPARED BY:

/s/ *W. Scott Stinett*
W. Scott Stinett
LLOYD & McDANIEL, PLC
P.O. Box 23200
Louisville, KY  40223-0200
(502) 736-4518
sstinnett@lloydmc.com
ATTORNEY FOR 211 N. ENGLISH STATION, LLC

-and-

/s/ *Dean Langdon*
Dean A. Langdon
DELCOTTO LAW GROUP, PLLC
200 N. Upper Street
Lexington, KY 40507
859-231-5800
dlangdon@dlgfirm.com
ATTORNEY FOR DEBTOR

**Exhibit A**

**LEASE WITH OPTION TO PURCHASE**

This Lease with Option to Purchase (this "Lease") is made and entered into as of August ___, 2022, by and between

**211 N ENGLISH STATION, LLC**
a Kentucky limited liability company.
11601 Main Street
Louisville, Kentucky 40243                                   ("Landlord")

and

**CAIR HEATING AND COOLING LLC**
a Kentucky limited liability company
Before Commencement:
1821 Cargo Court
Louisville, Kentucky 40299
After Commencement:
13101 Data Vault Drive
Louisville, Kentucky 40223                                   ("Tenant").

1.      **CERTAIN DEFINITIONS AND BASIC LEASE TERMS.**

        1.1      Basic Lease Information. In addition to the terms that are defined elsewhere in this Lease, these terms are used in this Lease:

        (a)      **Land**:  The "Land" means, initially, Tract 1 as shown on the plat attached and recorded with a Deed of record in Deed Book 7757, Page 708, in the office of the Clerk of Jefferson County, Kentucky (on which an existing building sits), and, subsequently (subject to the Minor Plat Contingency set forth in Section 20), a part of that existing land in substantially the size and configuration shown as Lot 2 on the Revised Development Plan attached to and made part of this Lease, labeled *Exhibit A*, with the Building to be constructed on that Lot 2.

        (b)      **Building**:  The "Building" means the approximately 26,610 square foot building to be constructed by Landlord on the Land, in the location generally shown on *Exhibit A*, as set forth in the Work Letter attached to and made part of this Lease, labeled *Exhibit B*.

        (c)      **Premises**:  The "Premises" means the Building and the Land (if and after approval of the Minor Plat defined in Section 20) and until and before approval and recording of the Minor Plat just the Building, with Tenant to have non-exclusive rights to the drives, parking areas and other common areas designated by Landlord on the existing Land, with those non-exclusive rights to cease upon approval and recording of the Minor Plat.

        (d)      **Term**:  the "Term" of this Lease is ten (10) years (plus the odd number of days, if any, to cause this Lease to expire on the last day of a calendar month), beginning on the Commencement Date and expiring on the Expiration Date.

        (e)      **Commencement Date**: The "Commencement Date" is the date that is the later of (i) August 1, 2023, or (ii) one (1) day after Landlord has Substantially Completed (as defined in the Work Letter) the Building and the Tenant Improvements (as defined in the Work Letter) and provided notice to Tenant that the Building and the Tenant Improvements have been Substantially Completed and that Tenant may have

possession of the Premises.

(f)    **Expiration Date**: The "Expiration Date" is the date that is ten (10) years after the Commencement Date (plus the odd number of days, if any, to cause this Lease to expire on the last day of a calendar month).

(g)    **Base Rent**:  Tenant shall pay "Base Rent" in equal monthly installments of "Monthly Base Rent" in the following amounts during the following periods:

| Period | Monthly Base Rent |
|---|---|
| Months 1 to 12 | $28,827.50 |
| Months 13 to 24 | $29,404.05 |
| Months 25 to 36 | $29,992.13 |
| Months 37 to 48 | $30,591.97 |
| Months 49 to 60 | $31,203.81 |
| Months 61 to 72 | $31,827.89 |
| Months 73 to 84 | $32,464.45 |
| Months 85 to 96 | $33,113.74 |
| Months 97 to 108 | $33,776.01 |
| Months 109 to 120 | $34,451.53 |

If the Commencement Date is not the first day of a calendar month, then on the Commencement Date Tenant shall pay an amount equal to $960.92 per day for each day in that month from and including the Commencement Date through and including the last day of the calendar month in which the Commencement Date occurs.

(h)    **Additional Rent**:  "Additional Rent" shall mean all other amounts payable by Tenant pursuant to this Lease, including without limitation Tenant's Share of Taxes [as set forth in Section 3.7(a)] and Tenant's Share of Operating Expenses [as set forth in Section 3.7(b)], all as set forth in this Lease.

(i)    **Security Deposit.**  The "Security Deposit" is $28,827.50, payable upon execution of this Lease.

(j)    **Brokers**. Commercial Kentucky, Inc., as Tenant's broker, and Capstone Realty, Inc., as Landlord's broker.

1.2    Interpretation. Each of the foregoing summary provisions shall be interpreted construed in conjunction with the other provisions of this Lease.

1.3    Net Lease. It is the intention of the parties that the Base Rent payable hereunder shall be net to Landlord, so that this Lease shall yield to Landlord the net Base Rent specified in this Lease, and that all additional costs, expenses and obligations relating to the Premises shall be paid by Tenant, except certain costs payable by Landlord pursuant to Section 6.1.

## 2.    CONSTRUCTION, LEASE, TERM; RENT.

2.1    Construction. Landlord shall construct the Building and make the Tenant Improvements according to the provisions of the Work Letter.

2.2    Grant and Premises.  Landlord leases the Premises to Tenant, and Tenant leases the Premises from Landlord, according to this Lease.

2

2.3    Term.  The term will be for the Term and will commence on the Commencement Date and will expire on the Expiration Date. Once the Commencement Date and the Expiration Date have been established, Landlord and Tenant, at the request of either, shall each execute and deliver to the other a "Commencement Date Certificate" in the form of *Exhibit C* attached as part of this Lease, but failure to execute and deliver the Commencement Date Certificate shall not invalidate the Commencement Date, the Expiration Date, the Term or other dates set forth in this Lease.

2.4    Rent.  Throughout the Term, Tenant shall pay Base Rent to Landlord as rent for the Premises. Base Rent and Additional Rent are sometimes collectively referred to as "Rent". Rent will be paid in advance on or before the first day of each calendar month of the Term. Rent will be paid to Landlord, without notice or demand, and without deduction or offset, in lawful money of the United States of America at Landlord's address, or to such other address or person or entity as Landlord may from time to time designate in writing. Rent is deemed paid only when actually received by Landlord. Tenant agrees to pay Rent by wire transfer of funds to Landlord's account of which Tenant is given notice from time to time, if so requested by Landlord.

2.5    Late Charge.  Any Rent not paid within five (5) days after the due date shall be subject to a late charge equal to five percent (5%) of such late payment. Such late charge shall constitute Additional Rent and shall be due and payable before or with the next monthly payment of Rent. Nothing in this Section shall be deemed to be in derogation of Landlord's rights under Section 14.

## 3.    TAXES, UTILITIES, OPERATING EXPENSES AND INSURANCE.

3.1    Property Taxes.  Landlord shall pay all ad valorem real property taxes and assessments affecting the Real Property. Tenant shall pay any federal, Kentucky, Jefferson County or City tax (including gross receipts tax but not any Louisville and Jefferson County license tax), assessment, levy or other charge if now or hereafter directly or indirectly imposed upon (a) Landlord with respect to this Lease or the value thereof, (b) Tenant's use or occupancy of the Premises, or (c) the Base Rent or any other sum payable under this Lease, as Additional Rent.

3.2    Other Taxes.  Tenant will pay promptly when due all personal property taxes on Tenant's personal property in the Premises and any other taxes payable by Tenant that if not paid might give rise to a lien on the Premises or Tenant's interest in the Premises.

3.3    Utilities.  All utilities services shall be in Tenant's name, and Tenant shall pay for such services directly to the provider.

3.4    Tenant's Liability Insurance.  Throughout the Term, Tenant shall maintain, at its sole expense, (a) commercial general public liability insurance, including bodily injury, property damage or other loss, insuring Tenant, Landlord, Landlord's lender (if any and if notice of the name and address of such lender is provided to Tenant), Landlord's ground lessor (if any and if notice of the name and address of such ground lessor is provided to Tenant), and Landlord's managing agent with respect to the Premises, in a company or companies reasonably satisfactory to Landlord, in an amount not less than One Million Dollars ($1,000,000) per occurrence and not less than Five Million Dollars ($5,000,000) aggregate, and (b) if, and to the extent required by law, worker's compensation or similar insurance offering statutory coverage and containing statutory limits. All such insurance shall: (1) be issued by a company that is licensed to do business in the Commonwealth of Kentucky that has a rating equal to or exceeding A:XI from Best's Insurance Guide; (2) name Landlord, its managing agent and its lender as additional insureds and/or loss payees as applicable (as their interests may appear), (3) contain an endorsement that such insurance shall remain in full force and effect notwithstanding that the insured may have waived its right of action against any person or entity prior to the occurrence of a loss; (4) provide (if allowed by law) that the insurer waives

3

all right of recovery by way of subrogation against Landlord, its partners, affiliates, agents and employees; (5) be primary and non-contributory, and (6) have a deductible amount of not more than $5,000.00. Tenant's insurer shall agree to provide Landlord thirty (30) days' prior written notice of any cancellation of insurance. Tenant shall deliver a certificate of all such insurance and receipts evidencing payment of the premium for such insurance (and, upon request, copies of all required insurance policies, including endorsements and declarations) to Landlord concurrently with Tenant's execution of this Lease and at least annually thereafter no later than ten (10) days before the expiration of any policy.

3.5    Personal Property Insurance. Tenant shall maintain in full force and effect insurance covering the full replacement value of all of Tenant's furniture and fixtures, machinery, equipment, stock, inventory, and any other personal property owned and used in Tenant's business and found in, on, or about the Premises, and all leasehold improvements to the Premises.

3.6    Waiver of Subrogation. Landlord and Tenant each waive any and all rights to recover against the other for any loss or damage to such waiving party arising from any cause covered by any property or liability insurance required to be carried by such party pursuant to this Section 3 or any other property insurance actually carried by such party to the extent of the limits of such policy. Tenant agrees to and shall defend, indemnify and hold harmless Landlord from and against any and all claims, demands, actions, losses, damages, costs and expenses (including without limitation attorney fees) arising from or related to an action by an employee of Tenant that could or should be covered by workers compensation insurance.

3.7    Taxes and Operating Expenses.

(a)    *Taxes*. "Taxes" means all federal, state, county or local governmental taxes, fees, charges, assessments or other impositions of every kind and nature, including without limitation real property ad valorem taxes, which Landlord shall pay during any calendar year, any portion of which occurs during the Term, because of or in connection with the ownership, leasing and operation of the Building and the Land. Notwithstanding the foregoing, there shall be excluded from Taxes, and Tenant will not be obligated to pay, any inheritance tax, gift tax, transfer tax, franchise tax, income tax (based on net income), profit tax, or capital levy imposed upon Landlord. Unless and until the Land is created as a separate tax parcel for ad valorem real property tax purposes, Tenant shall be responsible for an amount equal to 51.36% of Taxes. If and once the Land is created as a separate tax parcel for ad valorem real property tax purposes, Tenant shall be responsible for an amount equal to 100.0% of Taxes. Each such share is referred to as "Tenant's Share of Taxes".

(b)    *Operating Expenses*. Tenant shall pay to Landlord an amount equal to Tenant's Share of Operating Expenses. "Tenant's Share of Operating Expenses" is 100.0% of Operating Expenses. Operating Expenses" means:

(i)    All costs of management, operation, and maintenance of the Premises to be performed by Landlord (except as set forth in Section 6.1), all of which Landlord shall allocate only to the Building and to Lot 2 as shown on Exhibit A (regardless of whether the Minor Plat is approved and recorded), including without limitation wages, salaries, and compensation of employees; insurance obtained by Landlord as contemplated by Section 3.8; a management fee equal to four percent (4.0%) of Rent; consulting, accounting, legal, janitorial, maintenance, and other services; roof repairs; exterior grounds and landscaping maintenance; parking and drive areas; snow and ice removal; materials and supplies; general maintenance and repairs; maintenance fees or charges under any reciprocal easement or similar agreement affecting or benefiting the Land; and any other costs, charges, and expenses that under generally accepted accounting principles would be

4

regarded as management, maintenance, and operating expenses; and the cost (amortized over such period as Landlord will reasonably determine) together with interest at the greater of the prime rate prevailing plus 2% or Landlord's borrowing rate for such capital improvements plus 2% on the unamortized balance of any capital improvements that are made to the Building by Landlord (i) for the purpose of reducing operating expenses, or (ii) after the Lease date and by requirement of any governmental law or regulation that was not applicable to the Building at the time it was constructed and not as a result of special requirements for any Tenant use of the Building.

(ii)     The Operating Expenses will not, however, include: (A) depreciation on the Building (other than depreciation on personal property and equipment, if any, used by Landlord in performing its obligations under Section 6.2); (B) costs of alterations of space or other improvements made for tenants of the Building; (C) finders' fees and real estate brokers' commissions; (D) any ground lease payments, mortgage principal, or interest; (E) capital items other than those referred to in clause (i) above; (F) costs of replacements to personal property and equipment for which depreciation costs are included as an operating expense; and (G) the cost of repairs due to casualty or condemnation that are reimbursed by third parties.

(c)     *Manner of Payment.* Tenant's Share of Taxes and Tenant's Share of Operating Expenses shall be paid in the following manner. Landlord may reasonably estimate in advance the amounts Tenant shall owe for Tenant's Share of Taxes and of Tenant's Share Operating Expenses for any full or partial calendar year. Tenant shall then pay monthly in advance with Base Rent an amount equal to $1/12^{th}$ of the estimated amount for the calendar year. After each calendar year, Landlord shall provide to Tenant a statement of actual Taxes and actual Operating Expenses for the previous year and Tenant's actual Share of each. If Tenant has overpaid, then Landlord shall credit such overpayment on the next due payment of Rent or issue a check directly to the Tenant if the Lease has expired or terminated. If Tenant has underpaid, then Tenant shall pay the underpayment with the next due payment of Rent or Tenant shall promptly pay the deficiency if the Lease has expired or terminated. Tenant acknowledges that Landlord has not made any representation or given Tenant any assurances that the estimated Taxes or Operating Expenses will equal or approximate the actual Taxes or Operating Expenses for any calendar year during the term.

(d)     *Reconciliation.* Landlord shall maintain records respecting Taxes and Operating Expenses. Tenant shall have the right to examine such records upon reasonable prior notice and within 45 days of receiving Landlord's statement of actual Taxes and Operating Expenses, during normal business hours at the place where Landlord normally keeps such records. Tenant shall follow Landlord's reasonable procedures for examining such books and records. Tenant shall be deemed to have accepted the statement of actual Taxes and Operating Expenses unless Tenant takes exception in writing during that 45-day period. If Tenant takes exception, the matter to which exception is taken will be referred to Landlord's outside accounting firm, whose certification shall be final and conclusive. Tenant shall pay the cost of such review and certification by the accounting firm unless such review and certification determines there was an error to Tenant's detriment in excess of five percent (5.0%) of Tenant's actual Share of Taxes and Tenant's actual Share of Operating Expenses.

(e)     *Proration.* If the Term commences other than on January 1 or ends other than on December 31, Tenant's obligation to pay its estimated and actual Share of Taxes and Share of Operating Expenses for such first and final years shall be prorated to reflect the portion of such years.

3.8     Insurance. At all times during the term, Landlord will carry and maintain (a) all-risk property and casualty insurance, including theft, flood, earthquake and Rent loss insurance for one year of Rent for the Building, written at replacement cost value and with replacement cost endorsement, covering

the Building, its equipment and common area furnishings, (b) general commercial public liability insurance, with limits of not less than $2,000,000, which shall be secondary to the liability insurance Tenant is required to provide under this Lease, and (c) such other insurance as Landlord reasonably determines from time to time. The insurance coverage and amounts in this Section 3.8 will be reasonably determined by Landlord, based on coverage carried by prudent owners of comparable buildings in the vicinity of the Building.

4.    **USE.**

4.1    <u>Permitted Use and Compliance with Laws.</u>    Tenant may occupy and use the Premises for warehouse and distribution of heating, cooling and ventilating equipment and ancillary office and retail uses, and for no other purpose without the consent of Landlord, subject, however, to the terms and provisions of any covenants, easements, conditions, or restrictions which affect the use of the Premises. Tenant shall comply with all laws, ordinances and regulations affecting the Premise and Tenant's business conducted in the Premises, and Tenant shall not permit any unlawful occupation, business or trade to be conducted on any of the Premises or any use to be made thereof contrary to applicable laws or regulations. Tenant shall not use or occupy or permit any of the Premises to be used or occupied, nor do or permit anything to be done in or on any of the Premises, in a manner which would (i) violate any certificate of occupancy affecting any of the Premises, (ii) make void or voidable any insurance then in force with respect to any of the Premises or increase the cost of premiums or decrease the amount of coverage available, (iii) make it difficult or impossible to obtain fire or other insurance which is required hereunder, (iv) cause structural damage to the Building, or (v) constitute a public or private nuisance or waste. In no event shall Tenant conduct any retail sales in the Premises.

4.2    <u>Environmental Compliance.</u>    As part of its obligation to comply with laws and other requirements, Tenant shall not (either with or without negligence) generate, use, store, or cause or permit the escape, disposal or release of any Hazardous Materials in or about the Premises, the Building or the underlying property in violation of applicable law, or other rules or regulations Landlord may impose. Hazardous Materials shall mean (a) "hazardous wastes", as defined by the Resource Conservation and Recovery Act of 1976, as amended from time to time, (b) "hazardous substances", as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, (c) "toxic substances", as defined by the Toxic Substances Control Act, as amended from time to time, (d) "hazardous materials", as defined by the Hazardous Materials Transportation Act, as amended from time to time, (e) any applicable state or local laws and the regulations adopted under these acts, as amended from time to time, (f) oil or other petroleum products whether refined or unrefined, (g) any highly combustible substance and (h) any substance whose presence in Landlord's reasonable judgment could be detrimental to the Premises or hazardous to health or the environment. If any lender or governmental agency shall ever require testing to ascertain whether or not there has been any release of Hazardous Materials within the Premises during Tenant's occupancy hereunder, then the reasonable costs thereof shall be reimbursed by Tenant to Landlord upon demand as Additional Rent if such requirement applies to the Premises. In addition, Tenant shall execute affidavits, representations and the like from time to time at Landlord's request concerning Tenant's best knowledge and belief regarding the presence of Hazardous Materials in the Premises. In all events, Tenant shall indemnify and hold Landlord harmless of and from any and all costs and expenses of any nature arising from the release of Hazardous Materials in the Premises occurring while Tenant is in possession, and any adjacent real estate owned by Landlord, if caused by Tenant or persons acting under or through or with the permission of Tenant, including without limitation Tenant's agents, employees or contractors. If Tenant or persons acting under or through or with the permission of Tenant, including without limitation Tenant's agents, employees or contractors causes or is aware of any report of a spill or release or storage of Hazardous Materials, Tenant shall promptly notify Landlord thereof. If Tenant makes any cleanup of any such matter and/or files a report with respect to any such matter with any governmental or quasi-governmental agency, Tenant shall provide to Landlord a true and complete copy of the report. These provisions shall survive the expiration or other termination of this

Lease.

## 5. ASSIGNMENT AND SUBLETTING.

5.1    Prohibited Without Consent.    Tenant may not assign, mortgage, encumber or pledge this Lease, or sublet all or part of the Premises, without the prior written consent of Landlord. No assignment or subletting will release Tenant of its obligations under this Lease.

5.2    Procedure.    If Tenant wants to assign, sublet or otherwise transfer all or part of the Premises or this Lease, then Tenant shall give Landlord written notice ("Tenant's Request Notice") of the identity of the proposed assignee or subtenant and its business, all terms of the proposed assignment or subletting, the commencement date of the proposed assignment or subletting (the "Proposed Assignment/Sublease Commencement Date"), the area proposed to be sublet (the "Proposed Sublet Space") and such other information as Landlord may reasonably request. Tenant shall also transmit therewith the most recent financial statement or other evidence of financial responsibility of the proposed assignee or subtenant and a certification executed by Tenant and such proposed assignee or subtenant stating whether any premium or other consideration is being paid for the proposed assignment or sublease. Any permitted sublease, assignment or other transfer shall be effective on forms approved by Landlord. Tenant assigns to Landlord any sum due to Tenant from any assignee, subtenant or occupancy of Tenant as security for Tenant's performance of its obligations pursuant to this Lease, provided, however, that Tenant shall have the license to collect such rents provided prior to the occurrence of an Event of Default. Landlord's collection of such rent shall not be construed as an acceptance of such assignee, subtenant or occupant as a tenant nor a waiver of any default hereunder by Tenant.

## 6. MAINTENANCE.

6.1    By Landlord at Landlord's Cost.    Landlord, at Landlord's cost, shall (a) maintain the structural soundness of the Building, (b) maintain the foundation, and (c) be responsible for capital roof replacement, unless damage to any such items is caused by Tenant.

6.2    By Landlord as Operating Expenses.    Landlord shall repair and maintain the roof deck and roof surface of the Building, shall keep in good condition and repair the grounds, landscaping, parking and driveway areas comprising part of the Land (if and once the Minor Plat is approved and recorded) or common areas (until and unless the Minor Plat is approved and recorded). Tenant shall pay Tenant's Share of such costs as part of Operating Expenses.

6.3    By Tenant.    Except for maintenance obligations expressly assumed by Landlord under Sections 6.1 and 6.2, Tenant shall maintain and keep in good condition and repair the Premises, including making replacements. Without in any way limiting the generality of the previous sentence, Tenant shall be responsible for: (a) mechanical, plumbing and electrical systems; (b) the heating, ventilation and air conditioning system ("HVAC"), including without limitation having in effect a maintenance contract on the HVAC for the Premises, with a licensed HVAC contractor, providing for at least semiannual preventative inspection maintenance, including filter changes, adjustment of belt tension, lubrication, and general inspection and adjustment; (c) walls, doors, windows, and; (d) fire protection systems; and (e) signs. Tenant shall be responsible for janitorial service, pest control and trash removal. Tenant shall cause the sprinkler system (if any) in the Premises to be monitored. Tenant shall not commit physical waste, damage or injury to the Premises. With respect to any replacements, Tenant shall use materials of at least the same quality as those being replaced. Tenant shall also reimburse Landlord for any costs incurred by Landlord in making repairs or replacements that are otherwise Landlord's responsibility but were necessitated as a result Tenant's actions or negligence..

7.      **ALTERATIONS AND ALLOWANCE**.

7.1     Alterations. Tenant will not make any alterations, installments, changes, replacements, additions or improvements (collectively "Alterations"), in or to the Premises or any part thereof, without the prior written consent of Landlord. If Landlord elects to have the Alterations remain upon the Premises, Landlord's consent shall include Landlord's election. It is expressly understood that all Alterations shall be performed in a good and workmanlike manner and shall conform to all rules and regulations established from time to time by any applicable underwriter's association and conform to all requirements of local, state and federal governments. All Alterations shall be made at Tenant's sole expense, by contractors, or subcontractors reasonably approved by Landlord, and only after (a) Tenant has obtained all necessary permits from governmental authorities and (b) Tenant has submitted complete plans and specifications to Landlord with respect to the Alterations and Landlord has approved them, which approval shall not be unreasonably withheld. No such approval by Landlord will in any way imply that the Alterations comply with applicable laws and codes, compliance with which remains the sole responsibility of Tenant. If any mechanic's lien is filed against the Premises for work or materials furnished to Tenant, the lien shall be discharged or bonded off by Tenant, solely at Tenant's expense, within thirty (30) days after Tenant receives notice thereof. Tenant shall indemnify and hold harmless Landlord from any and all expenses (including attorney's fees), liens and claims or damage to persons, property, or the Building, which may arise from the making of any Alterations. Tenant will deliver to Landlord a complete set of "as built" plans showing the approved Alterations.

7.2     Remain with Premises. Tenant agrees that all Alterations upon the Premises (whether with or without Landlord's consent), shall at the election of Landlord, which may be provided in the written consent required above, either remain upon the Premises and be surrendered with the Premises at the expiration of this Lease or be removed by Tenant at Tenant's cost. Notwithstanding the foregoing, provided that Tenant is not in default under this Lease, Tenant shall have the right to remove, prior to the expiration or termination of this Lease, all movable furniture, fixtures or equipment installed in the Premises solely at Tenant's expense.

7.3     Equipment. Tenant shall not install any other equipment of any kind or nature whatsoever which will or may necessitate any changes, replacements or additions to or unreasonably burden the water system, air conditioning system or the electrical system of the Premises, or exceed the floor load capacity of the Premises, without the prior written consent of the Landlord. If Tenant wishes to install machinery or mechanical equipment which may cause noise or vibration to be transmitted to the structure of the Building or any space therein, such machinery shall be installed and maintained by Tenant, at Tenant's expense, on vibration eliminators or other devices sufficient to eliminate such noise and vibration, all in accordance with Landlord's requirements. Tenant may, at its expense, install and remove additional equipment and machinery used or useful in Tenant's business, which equipment and machinery shall remain the property of Tenant and shall not become part of the real estate, provided that such installation shall not reduce the value of the Premises or its usefulness. Any equipment of Tenant not removed by Tenant within ten (10) days after the expiration or earlier termination of this Lease shall be considered abandoned by Tenant and may be appropriated, sold, destroyed or otherwise disposed of by Landlord without first giving notice thereof and without obligation to account therefor. Notwithstanding any other provision of this Lease, Tenant may not install any equipment which emits electromagnetic, microwave, ultrasonic, laser, or other radiation which Landlord determines causes a risk to persons or property or interferes with telecommunications transmissions or computer use.

7.4     Contractors. Tenant shall require any contractor retained by it to perform any Alteration to carry and maintain at Tenant's or such contractor's expense (and furnish the policy, policies or certificates thereof to Landlord, Landlord's lender) during such times as contractor is working in the Premises, (i) commercial general liability insurance policy, including, but not limited to, contractor's liability coverage,

8

contractual liability coverage, complete operations coverage, broad form property damage endorsement and contractor's protective liability coverage, to afford protection with limits per person and for each occurrence, of not less than One Million ($1,000,000), combined single limit, with respect to personal injury and death and property damage, such insurance to provide for no deductible, to name Landlord, Landlord's lender and ground lessor as additional insureds and (ii) worker's compensation insurance or similar insurance in form and amounts as required by law.

**8.     SURRENDER.** At the expiration or other termination of this Lease, Tenant will promptly quit and surrender the Premises broom-clean, in good order and repair, ordinary wear and tear excepted. Tenant shall remove from the Premises any trade fixtures, equipment, and movable furniture placed in the Premises by Tenant, and Tenant shall remove any Alterations directed to be removed by Landlord. Tenant will fully repair any damage occasioned by the removal of any trade fixtures, equipment, furniture and Alterations. All trade fixtures, equipment, furniture, inventory, effects, and Alterations in the Premises after the end of the Term will be deemed conclusively to have been abandoned and may be disposed of by Landlord without written notice to Tenant and without obligation to account for them. Tenant will pay Landlord for all expenses incurred in connection with the removal of such property, including but not limited to the cost of repairing any damage to the Premises caused by the removal of such property. Tenant's obligation to observe and perform this covenant will survive the expiration or other termination of this Lease.

**9.     CONDEMNATION.**

9.1     Award. If any or all of the Premises are taken by the exercise of any power of eminent domain or are conveyed to or at the direction of any governmental entity under a threat of any such taking ("Condemnation"), Landlord shall be entitled to collect from the condemning authority thereunder the entire amount of any award made in any such proceeding or as consideration for such deed, without deduction therefrom for any leasehold or other estate held by Tenant by virtue of this Lease. Tenant hereby (a) assigns to Landlord all of Tenant's right, title and interest, if any, in and to any such award; (b) waives any right which it may otherwise have in connection with such Condemnation, against Landlord or such condemning authority, to any payment for (i) the value of the then unexpired portion of the Term, (ii) leasehold damages, and (iii) any damage to or diminution of the value of Tenant's leasehold interest under this Lease or any portion of the Premises not covered by such Condemnation; and (c) agrees to execute any and all further documents which may be required in order to facilitate the Landlord's collection of any and all such awards. Notwithstanding the foregoing, Tenant may seek a separate award pursuant to applicable law, so long as such separate award in no way diminishes and/or delays any award or payment which Landlord would otherwise receive as a result of such Condemnation.

9.2     Total Taking. If (a) all of the Premises are taken by a Condemnation, or (b) if a substantial part of the Premises is taken by a Condemnation such that the remainder is insufficient for the reasonable operation of Tenant's business, or (c) any of the building comprising part of the Premises is taken by a Condemnation and, in Landlord's reasonable opinion, reasonably concurred in by Tenant, it would be impractical to restore the remainder of the Premises, then, in any such event, this Lease shall terminate on the date upon which possession is taken by the condemning authority, and all Rent shall be prorated and paid to such date.

9.3     Partial Taking. If there is a Condemnation and this Lease does not terminate pursuant to the Section 9.2, the operation and effect of this Lease shall be unaffected by such Condemnation, except that the Base Rent shall be reduced in proportion to the square footage, if any, of the Premises covered by such Condemnation.

9.4     Waivers. If there is a Condemnation, Landlord shall have no liability to Tenant on account of any (i) interruption of Tenant's business upon the Premises, (ii) diminution in Tenant's ability to use the

9

Premises, or (iii) other injury or damage sustained by Tenant as a result of such Condemnation. Except for any separate award to Tenant under the provisions of Section 9.1, Landlord shall be entitled to conduct any such condemnation proceeding and any settlement thereof free of interference from Tenant, and Tenant hereby waives any right which it might otherwise have to participate therein.

## 10.    DAMAGE AND DESTRUCTION.

10.1    Damage. If the Premises are damaged by fire or other insured casualty, Landlord will give Tenant written notice of the time which will be needed to repair such damage, as determined by Landlord in its reasonable discretion, and the election which Landlord has made according to this Section 10. Such notice will be given within fifteen (15) days after the date Landlord has received approval of its insurance claim (the "notice date") after the fire or other insured casualty.

10.2    Rebuilding; Lease Continues. If the Premises are damaged by fire or other insured casualty to an extent which may be repaired within 180 days after the notice date, as reasonably determined by Landlord, Landlord will promptly begin to repair the damage after the notice date and will diligently pursue the completion of such repair. In that event this Lease will continue in full force and effect except that Base Rent and Additional Rent will be abated on a pro rata basis from the date of the damage until the date of the completion of such repairs (the "repair period") based on the proportion of the rentable area of the Premises Tenant is unable to use during the repair period.

10.3    Right to Terminate. If the Premises are damaged by fire or other insured casualty to an extent that it may not be repaired within 180 days after the notice date, as reasonably determined by Landlord, then (a) Landlord may terminate this Lease as of the date of such damage by written notice given to Tenant on or before the notice date, or (b) Tenant may terminate this Lease as of the date of such damage by written notice given to Landlord within 10 days after Landlord delivery of a written notice that the repairs cannot be made within such 180 day period. If neither Landlord nor Tenant so elects to terminate this Lease, Landlord will diligently proceed to repair the Premises and Base Rent will be abated on a pro rata basis during the repair period based on the proportion of the rentable area of the Premises Tenant is unable to use during the repair period.

10.4    Tenant Acts.    If any such damage by fire or other casualty is the result of the willful conduct or negligence or failure to act of Tenant, there will be no abatement of Base Rent as otherwise provided for in this Section 10.

## 11.    SUBORDINATION.

11.1    General. This Lease and Tenant's rights under this Lease are subject and subordinate to any mortgage or other lien or encumbrance ("lien") now or after the date hereof affecting or placed against the Premises (except to the extent any such instrument expressly provides that this Lease is superior to such instrument). This provision will be self-operative and no further instrument of subordination will be required in order to effect it. Notwithstanding the foregoing, Tenant will execute, acknowledge, and deliver to Landlord, within 20 days after written demand by Landlord, such subordination, nondisturbance and attornment agreements as may be reasonably requested by Landlord or the holder of any lien to confirm or effect any such subordination.

11.2    Attornment and Nondisturbance. Tenant agrees that if any holder of a lien succeeds to Landlord interest in the Premises, Tenant will pay to such holder all rents subsequently payable under this Lease. Further, Tenant agrees that in the event of the enforcement by the holder of a superior lien of the remedies provided for by law or by such superior lien, Tenant will, upon request of any person or party succeeding to the interest of Landlord as a result of such enforcement, automatically become the Tenant of

and attorn to such successor in interest without change in the terms or provisions of this
Notwithstanding any subordination of this Lease, in no event shall Tenant's right to possession be dis
(or this Lease be terminated) upon foreclosure of any mortgage, so long as Tenant is not in
hereunder.

**12.    ENTRY BY LANDLORD.**  Landlord, its agents, employees, and contractors may en
Premises at any time in response to an emergency and at reasonable hours after 24 hours' notice to
to inspect the Premises or to exhibit the Premises to prospective purchasers, lenders, or tenants.

**13.    LIABILITY AND INDEMNIFICATION.**

13.1    Indemnity.  Landlord shall not be liable for any injury, loss or damage of whatever
to any persons or property arising within the Premises, unless caused by the gross negligence or wil
of Landlord, its agents, employees or contractors.  Except for any injury or damage to persons or p
on the Premises that is proximately caused by or results from the gross negligence or willful act of La
its agents, employees or contractors, Tenant shall defend, indemnify and hold harmless Landlo
employees, and agents from and against, any and all demands, claims, causes of action, fines, pe
damages, liabilities, judgments, and expenses (including without limitation reasonable attorneys
incurred in connection with or arising from the use or occupancy or manner of use or occupancy
Premises or common areas by Tenant or any person claiming under Tenant,  any breach by Tenan
employees, agents, contractors, or invitees of this Lease, and any injury or damage to the person, pr
or business of Tenant, its employees, agents, contractors, or invitees entering upon the Premises un
express or implied invitation of Tenant.  If any action or proceeding is brought against Landlo
employees, or agents by reason of any such claim for which Tenant has indemnified Landlord, T
upon written notice from Landlord, will defend the same at Tenant's expense, with counsel reas
satisfactory to Landlord.

13.2    Personal Property and Business.  All personal property of Tenant in the Premises s
at the sole risk of Tenant.  Landlord shall not be liable for any accident to or damage to the prop
Tenant resulting from the use or operation of the heating, cooling, electrical or plumbing apparatus
other cause whatsoever.  Landlord shall not be liable in damages, nor shall this Lease be affect
conditions arising or resulting, and which may the Premises due to construction on contiguous p
unless such construction renders the Premises untenantable or practical use for Tenant's purposes.  La
assumes no liability or responsibility whatsoever to the conduct and operations of the business
conducted in the Premises.  Landlord shall not be liable for any accident to or injury to any person or p
or property in or about the Premises that are caused by the conduct and operation of said busines
virtue of equipment or property of Tenant in the Premises.

13.3    No Liability.  Except to the extent caused by the gross negligence or willful misc
of Landlord, its agents or employees, Landlord shall have no liability to Tenant, its employees,
invitees, licensees, customers, clients or guests for any damage, compensation or claim arising fr
repair by Landlord of any portion of the Premises, any interruption in the use of the Premises, acci
damage resulting from the use or operation (by Landlord, Tenant or any other person) of heating, c
electrical or plumbing equipment or apparatus, or from untenantability of the Premises resulting fr
or other casualty, or from any robbery, theft, mysterious disappearance and/or any other casualty, c
any leakage in any part or portion of the Premises or the Building, or from water, rain or snow th
leak into or flow from any part of the Premises, or from drains, pipes or plumbing work in the Build
from any other cause whatsoever.  Any goods, property or personal effects, stored or placed by Te
or about the Premises shall be at the risk of Tenant, and Landlord shall not in any manner be held resp
therefor.

11

## 14.   **DEFAULT AND REMEDIES**.

14.1   <u>Events of Default.</u> As used in this Lease, each of the following events shall constitute and is referred to as, an "Event of Default": (a) If Tenant (i) fails to pay Base Rent, Additional Rent or any other sum which Tenant is obligated to pay by any provision of this Lease, when and as it is due and payable hereunder and without demand therefor, or (ii) in any respect violates any of the terms, conditions or covenants set forth in the provisions of this Lease; or (b) if Tenant (i) applies for or consents to the appointment of a receiver, trustee or liquidator of Tenant or of all or a substantial part of its assets, (ii) files a voluntary petition in bankruptcy or admits in writing its inability to pay its debts as they come due, (iii) makes an assignment for the benefit of its creditors, (iv) files a petition or an answer seeking a reorganization or an arrangement with creditors, or seeks to take advantage of any insolvency law, (v) performs any other act of bankruptcy, or (vi) files an answer admitting the material allegations of a reorganization insolvency proceeding;  or (c)  if an order of relief or other order, judgment or decree is entered by any court of competent jurisdiction adjudicating Tenant as insolvent, or otherwise entitled to the protection of or subject to any bankruptcy statute, approving a petition seeking such a reorganization, or appointing a receiver, trustee or liquidator of Tenant or otherwise commence with respect to Tenant or any of its assets any proceeding under any bankruptcy, reorganization, arrangement, insolvency, readjustment, receivership or similar law, and if such order, judgment, decree or proceeding continues unstayed for more than sixty (60) consecutive days after the expiration of any stay thereof.

14.2   <u>Notice; Grace Period.</u>  Upon the occurrence of an Event of Default Tenant shall not be deemed to be in default, and Landlord shall not exercise any right or remedy which it holds under any provision of this Lease or under applicable law until (a) Landlord has given written notice thereof to Tenant, and (b) Tenant has failed, (i) if such Event of Default consists of the failure to pay money, within five (5) calendar days after the date Landlord presents notice to pay all of such money, together with interest thereon and any late charge that is due, or (ii) if such Event of Default consists of something other than the failure to pay money, within fifteen (15) days thereafter to commence actively, diligently and in good faith to proceed to cure such Event of Default and to continue to do so until it is fully cured; provided however, if Tenant commences to cure such default during such fifteen (15) day period, and such default cannot be cured within such period despite diligent effort, Tenant shall be afforded such additional time as may reasonably be required to affect a cure provided that Tenant continues to diligently pursue such cure.  No notice of default shall be required of Landlord, and Tenant shall be entitled to no grace period, more than once with respect to monetary default during each calendar year.

14.3   <u>Remedies.</u>  Upon the occurrence of an Event of Default, Landlord, at its option, may terminate this Lease, or without terminating this Lease terminate Tenant's right of possession, may pursue any and all other remedies available to it under the laws of the Commonwealth of Kentucky, including, by way of example rather than of limitation, the rights to (a) re-enter and repossess the Premises, with lawful force, and any and all improvements thereon and additions thereto;  (b) immediately recover an amount equal to the present value (as of the date of Tenant's default) of the Base Rent and Additional Rent which would have become due through the date on which the Term would have expired but for Tenant's default, which damages shall be payable to Landlord in a lump sum on demand.  For purposes of this Section, present value shall be computed by discounting at a rate equal to two percent (2.0%) above the "prime rate" as then published in the Wall Street Journal, and collect such balance in any manner not inconsistent with applicable law; (c) relet any or all of the Premises for Tenant's account for any or all of the remainder of the Lease Term, or for a longer term; and/or (d) recover from Tenant the cost to Landlord of any reasonable fees relating to reletting of the Premises including but not limited to construction costs, brokerage fees, reasonable attorney's fees.

14.4   <u>Cumulative Rights.</u>  Landlord's rights and remedies set forth in this Lease are cumulative and in addition to Landlord's other rights and remedies at law or in equity, including those available as a

12

result of any anticipatory breach of this Lease. Landlord's exercise of any such right or remedy shall not prevent the concurrent or subsequent exercise of any other right or remedy. Landlord's delay or failure to exercise or enforce any of Landlord's rights or remedies or Tenant's obligations shall not constitute a waiver of any such rights, remedies or obligations. Landlord shall not be deemed to have waived any default unless such waiver expressly set forth in an instrument signed by Landlord. Any such waiver shall not be construed as a waiver of any covenant or condition except as to the specific circumstances described in such waiver. Neither Tenant's payment of an amount less than a sum due nor Tenant's endorsement or statement on any check or letter accompanying such payment shall be deemed an accord and satisfaction. Notwithstanding any request or designation by Tenant, Landlord may apply any payment received from Tenant to any payment then due. Landlord may accept the same without prejudice to Landlord's right to recover the balance of such sum or to pursue other remedies. Re-entry and acceptance of keys shall not be considered an acceptance of a surrender of this Lease.

14.5    Right of Landlord to Cure Tenant's Default. If Tenant defaults in the performance of any of its obligations under this Lease, then Landlord shall have the right (but not the duty) to perform such obligation, and Tenant shall reimburse Landlord for any costs and expenses thereby incurred, together with interest thereon at that rate per annum that is two percent (2%) greater than the "prime rate" as then published in the Wall Street Journal, from the date such costs and expenses are incurred by Landlord to the date of payment thereof by Tenant; provided, however, that nothing herein contained shall be construed or implemented in such a manner as to allow Landlord to charge or receive interest in excess of the maximum legal rate then allowed by law. Such payment and interest shall constitute Additional Rent hereunder, which shall be due and payable with the next monthly payment of Base Rent; but the making of such payment or the taking of such action by Landlord shall not operate to cure such default or to stop Landlord from the pursuit of any remedy to which Landlord would otherwise be entitled.

14.6    Lien on Personal Property. As security for all of Tenant's obligations under this Lease, Tenant hereby grants to Landlord a Uniform Commercial Code security interest in all of Tenant's tangible and intangible personal property now or hereafter located upon the Premises, but excluding from that security interest all of Tenant's inventory. Landlord may enforce its security interest pursuant to any applicable law then in effect. Tenant shall, within five (5) days after request, execute any document, including financing statements, reasonably required by Landlord to perfect the security interest herein provided. The security interest provided herein shall be in addition to, and not in lieu of, any common law or statutory Landlord lien provided under applicable law, and Landlord's rights and remedies provided in this Section shall be in addition to, and not in lieu of, any other rights and remedies available to Landlord pursuant to the terms of this Lease or pursuant to applicable law.

**15.    SECURITY DEPOSIT**. The Security Deposit shall be held by Landlord as security for the payment and performance by Tenant of all Tenant's obligations, covenants, conditions and agreements under this Lease. Within 30 days after the expiration of the Term, Landlord shall, if Tenant is not in default, return such Security Deposit to Tenant without interest, less any such portion thereof as Landlord shall have appropriated to make good any default by Tenant with respect to Tenant's obligations. If Tenant defaults during the Term, Landlord shall have the right, but not the obligation, to apply all or any portion of the Security Deposit to remedy such default, in which event Tenant shall promptly deposit with Landlord the amount necessary to restore the Security Deposit to its original amount. The Security Deposit shall not be deemed liquidated damages, and Landlord's application of the Security Deposit to reduce its damages shall not preclude recovery from Tenant of any additional damages incurred by Landlord. Landlord is not required to hold the Security Deposit in a separate account. If Landlord sells or transfers its interest in the Property, Landlord shall transfer the Security Deposit to the grantee, and Landlord shall be released from all liability to Tenant for the return of the Security Deposit.

**16.    SIGNS**. Subject to Landlord's approval as to size, location and design, Tenant may, from time to

13

time, install a sign or signs on the Premises. Such installation (a) shall be at Tenant's sole cost and expense; (b) shall be performed in a good and workmanlike manner; and (c) shall be performed in accordance with all applicable laws, ordinances and regulations, and only after Tenant has obtained all required permits. Landlord, at no cost to Landlord, shall execute and deliver any commercially reasonable applications for permits.

**17.    QUIET ENJOYMENT.** Landlord hereby covenants that Tenant, on paying the Base Rent and Additional Rent and performing the covenants and agreements set forth in this Lease, shall without interference from Landlord peaceably and quietly hold and enjoy, throughout the Term the Premises and such rights as Tenant holds under this Lease with respect to the Premises.

**18.    GUARANTY.** [intentionally omitted]

**19.    GENERAL.**

19.1    Time of the Essence. Time is of the essence of each and every provision of this Lease.

19.2    No Waiver. The waiver by Landlord of any agreement, condition, or provision contained in this Lease will not be deemed to be a waiver of any subsequent breach of the same or any other agreement, condition, or provision contained in this Lease, nor will any custom or practice that may grow up between the parties in the administration of the terms of this Lease be construed to waive or to lessen the right of Landlord to insist upon the performance by Tenant in strict accordance with the terms of this Lease. The subsequent acceptance of rent by Landlord will not be deemed to be a waiver of any preceding breach by Tenant of any agreement, condition, or provision of this Lease, other than the failure of Tenant to pay the particular rent so accepted, regardless of Landlord knowledge of such preceding breach at the time of acceptance of such rent.

19.3    Limitation on Recourse. Tenant specifically agrees to look solely to Landlord interest in the Premises for the recovery of any judgments from Landlord, and neither Landlord nor any of its members, managers, directors, shareholders, partners, employees or agents shall be personally liable for any such judgments. In the event of any transfer of Landlord's interest in the Premises, Landlord shall be automatically freed and relieved from all applicable liability accruing thereafter with respect to performance of any covenant or obligation on the part of Landlord, provided any deposits or advance rents held by Landlord are turned over to the grantee and the grantee expressly assumes, subject to the limitations of this Section 19.3 all of the terms, covenants and conditions of this Lease to be performed on the part of Landlord, it being intended hereby that the covenants and obligations contained in this Lease on the part of Landlord shall be binding on Landlord, its successors and assigns, only during their respective periods of ownership. Landlord may freely assign its interest under this Lease. Following any such assignment, Landlord shall remain liable for performance of all obligations of the Landlord hereunder incurred prior to such assignment.

19.4    Estoppel Certificates. At any time and from time to time but within 10 days after prior written request by Landlord, Tenant will execute, acknowledge, and deliver to Landlord, promptly upon request, a certificate certifying (a) that this Lease is unmodified and in full force and effect or, if there have been modifications, that this Lease is in full force and effect, as modified, and stating the date and nature of each modification; (b) the date, if any, to which rent and other sums payable under this Lease have been paid; (c) that no written notice of any default has been delivered to Landlord which default has not been cured, except as to defaults specified in said certificate; (d) that there is no event of default under this Lease or an event which, with notice or the passage of time, or both, would result in an event of default under this Lease, except for defaults specified in said certificate; and (e) such other matters as may be reasonably requested by Landlord. Any such certificate may be relied upon by any prospective purchaser or existing or prospective mortgagee of the Premises. Tenant's failure to deliver such a certificate within such time will

14

be conclusive evidence of the matters set forth in it.

19.5    Holding Over. Tenant acknowledges that it is extremely important that Landlord have substantial advance notice of the date on which Tenant will vacate the Premises, because Landlord will (a) require an extended period to locate a replacement tenant, and (b) plan its leasing and renovation program for the Premises in reliance on its lease expiration dates. Tenant also acknowledges that if Tenant fails to surrender the Premises at the expiration or earlier termination of the Lease Term, then it will be conclusively presumed that the value to Tenant of remaining in possession, and the loss that will be suffered by Landlord as a result thereof, far exceed the Base Rent and Additional Rent that would have been payable had the Lease Term continued during such holdover period. Therefore, if Tenant (or anyone claiming through Tenant) does not immediately surrender the Premises or any portion thereof upon the expiration or earlier termination of the Lease Term, then the rent shall be increased to One Hundred Fifty (150%) per cent of the Base Rent, Additional Rent and other sums that would have been payable pursuant to the provisions of this Lease if the Lease Term had continued such holdover period. Such Rent shall be computed by Landlord on a daily basis and shall be payable on the first day of such holdover period and the first day of each calendar month thereafter during such holdover period until the Premises have been vacated. Notwithstanding any other provision of this Lease, Landlord's acceptance of such holdover Rent shall not in any manner adversely affect Landlord's other rights and remedies, including Landlord's right to evict Tenant and to recover all damages. Any holdover shall be deemed to be a tenancy-at-sufferance and not a tenancy-at-will or tenancy from month-to-month; provided, however, that Landlord may, in addition to its other remedies, elect, in its sole discretion, to treat such holdover as the creation of a month-to-month tenancy with Tenant. In no event shall any holdover be deemed a permitted extension or renewal of the Term, and nothing contained herein shall be construed to constitute Landlord's consent to any holdover or to give Tenant any right with respect thereto. Except as otherwise specifically provided in this Section 19.5, all terms of this Lease shall remain in full force and effect during the holdover period.

19.6    Notices. Any notice, request, demand, consent, approval, or other communication required or permitted under this Lease must be in writing and will be deemed to have been given when personally delivered, sent by email (if email addresses are provided by Landlord to Tenant, or by Tenant to Landlord), deposited with any nationally recognized overnight carrier that routinely issues receipts, addressed to the party for whom it is intended at its address set forth in this Lease, or to such other addresses of which the other party is given written notice pursuant to this Section. Failure or refusal to accept delivery shall be deemed receipt.

19.7    Severability. If any provision of this Lease proves to be illegal, invalid, or unenforceable, the remainder of this Lease will not be affected by such finding, and in lieu of each provision of this Lease that is illegal, invalid, or unenforceable a provision will be added as a part of this Lease as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

19.8    Amendment. No amendment, alteration, modification of, or addition to the Lease will be valid or binding unless expressed in writing and signed by Landlord and Tenant.

19.9    Entire Agreement. This Lease contains the entire agreement between Landlord and Tenant. No promises or representations, except as contained in this Lease, have been made to Tenant respecting the condition or the manner of operating the Premises.

19.10    Captions. The captions of the various sections of this Lease are for convenience only and do not necessarily define, limit, describe, or construe the contents of such sections.

19.11    Notice of Landlord Default. In the event of any alleged default in the obligation of Landlord under this Lease, Tenant will deliver to Landlord written notice listing the reasons for Landlord default and

Landlord will have 30 days following receipt of such notice to cure such alleged default or, in the event the alleged default cannot reasonably be cured within a 30-day period, to commence action and proceed diligently to cure such alleged default.

19.12   Governing Law. This Lease will be governed by and construed pursuant to the laws of the Commonwealth of Kentucky.

19.13   Binding Effect. The covenants, conditions, and agreements contained in this Lease will bind and inure to the benefit of Landlord and Tenant and their respective heirs, executors, administrators, successors, and, except as otherwise provided in this Lease, their assigns.

19.14   Force Majeure. If Landlord or Tenant shall be delayed, or hindered, or prevented from the performance of any act required hereunder (except for the payment of monies), by reason of government restrictions, scarcity of labor or materials, or for other reasons beyond its reasonable control, the performance of such act shall be excused for the period of delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.

19.15   Short Form. This Lease shall not be recorded. The parties agree to execute a short form of this Lease, which may, at the request of either party, be recorded in the real estate records of Jefferson County, Kentucky, setting forth only the term, the Premises, and the identity of Landlord and Tenant. The expense thereof shall be borne by the requesting party.

19.16   Tenant's Authority. Tenant hereby warrants and represents that each individual executing this Lease on behalf of Tenant is duly authorized to execute and deliver this Lease and that Tenant is an entity duly formed and existing under the laws of the Commonwealth of Kentucky, and has the power and authority to enter into this Lease, and that all action requisite to authorize Tenant to enter into this Lease has been duly taken.

19.17   Commission; Disclosure. Landlord and Tenant each represent and warrant that neither has had any dealings with any realtor, broker or agent in connection with the negotiation of this Lease, except the Brokers identified in Section 1.1(j). Landlord shall pay a commission to the Brokers pursuant to a separate agreement or agreements. Should any claim for a commission be made by any other broker or agent, the party responsible for such claim shall defend, indemnify and hold harmless the other party from and against any claims, demands, damages, losses, costs or expenses (including attorney fees) arising from the action of the party breaching the foregoing representation and warranty. Gabriel J. Molnar discloses that he is a licensed agent with Capstone Realty, Inc. and is a member of Landlord.

19.18   Waiver of Jury Trial. Landlord and Tenant waive trial by jury in any action, claim or counterclaim brought in connection with landlord-tenant relationship, tenant's use or occupancy of the premises or any claim of injury or damage. Tenant consents to service of process and any pleading relating to any such action at the Premises; provided, however, that nothing herein shall be construed as requiring such service at the Premises. Landlord, Tenant waives any objection to the venue of any action filed in any court situated in the jurisdiction in which the Premises are located and waive any right under the doctrine of forum non conveniens or otherwise to transfer any such action filed in any such court to any other court.

19.19   Litigation. The prevailing party shall recover all reasonable attorney's fees and costs incurred by or on behalf of such prevailing party if (a) either party institutes litigation for a breach of the terms and conditions of this Lease, (b) either party institutes litigation for possession of the Premises, (c) either party is made party to litigation instituted by a third party relating to Premises. Such attorney's fees and costs may be levied against the party whose conduct necessitated the use of an attorney whether or not litigation is prosecuted to judgment.

19.20    Financial. Within fifteen (15) days after request by Landlord, Tenant will provide to Landlord Tenant's balance sheet and an income and expense statement for the previous calendar year and for the current year to date, certified by Tenant's chief financial officer. Landlord will keep confidential that financial information except that Landlord may disclose the information as required by law, and Landlord may disclose the information to lenders or prospective lenders, to purchasers and prospective purchasers, and to Landlord's professional advisors, but only if such persons covenant to keep Tenant's information confidential.

**20.    OPTION TO PURCHASE**. In consideration of this Lease, Landlord hereby grants to Tenant the option to purchase (the "Option") the Premises.

(a)    Minor Plat and Minor Plat Contingency. Landlord shall use commercially reasonable efforts to cause the existing Land to be legally subdivided into Lot 1 and Lot 2 in the substantially the size and configuration shown on *Exhibit A*, which requires approval of a minor subdivision plat by the Louisville Metro Planning Commission and certain other governmental and quasi-governmental agencies. Obtaining such approval (the "Minor Plat Contingency" is a condition precedent to the provisions of this Section 20 and the Option. Accordingly, if the Minor Plat Contingency is not satisfied by a date that is four (4) years after the Commencement Date, the provisions of this Section 20 are null and void; the remainder of this Lease shall, however, remain in full force and effect. When the Minor Plat Contingency is satisfied, Landlord shall give Tenant notice of satisfaction. If and once approved, the approved minor subdivision plat is referred to as the "Minor Plat". If and once approved, Landlord may record the Minor Plat whenever it chooses to; if not recorded before the Closing, however, the Minor Plat shall be recorded at Closing as an exhibit to the special warranty deed to Tenant.

(b)    Purchase Price. The "Purchase Price" for the Premises if the option is exercised shall be an amount equal to the greater of (i) FIVE MILLION SEVEN HUNDRED AND FIFTY THOUSAND DOLLARS ($5,750,000.00) (the "Minimum Price"), or (ii) the Appraised Value. The "Appraised Value" shall be determined as follows.

(i)    *By Agreement.* Landlord and Tenant may attempt to agree on the value of the Premises. If they agree and if that that value is greater than the Minimum Price, then that agreed value shall be the Appraised Value and also the Purchase Price, and Landlord and Tenant shall memorialize that agreement in writing by an amendment to this Lease. If they agree but if that value is less than the Minimum Price, then the Minimum Price shall be the Purchase Price, and Landlord and Tenant shall memorialize that agreement in writing by an amendment to this Lease.

(ii)    *By Appraisal.* If by the date that is four (4) years and three (3) months after the Commencement Date, Landlord and Tenant have not agreed on the value of the Premises and accordingly have not established the Purchase Price by amendment to this Lease as set forth in Section 20(b)(i), then within fifteen (15) days thereafter, each of Landlord and Tenant shall appoint a Qualified Appraiser and notify the other of such appointment. The term "Qualified Appraiser" means an independent MAI appraiser with at least ten (10) years of experience in appraising commercial space substantially similar to the Premises in Louisville, Kentucky. If one party fails to appoint a Qualified Appraiser within that 15-day period, then the one appointed Qualified Appraiser, acting alone, shall determine the Appraised Value. If both parties properly and timely designate a Qualified Appraiser, then those Qualified Appraisers shall have forty-five (45) days after appointment to confer with each other in an attempt to reach an agreement as to the Appraised Value. If the two Qualified Appraisers concur as to the determination of the Appraised Value, such determination shall be final and binding on Landlord and Tenant. If the two Qualified

17

Appraisers fail to agree within the 45-day period, then they shall designate a third disinterested and independent Qualified Appraiser within fifteen (15) days after their failure to agree. Within thirty (30) days after submission of the matter to the third Qualified Appraiser, the third Qualified Appraiser shall determine the Appraised Value by choosing whichever of the estimates submitted by Landlord's Qualified Appraiser and Tenant's Qualified Appraiser the third Qualified Appraiser judges to be more accurate; for removal of doubt, the third Qualified Appraiser may only select either the Appraised Value set by Landlord's Qualified Appraiser or the Appraised Value set by Tenant's Qualified Appraiser and may not determine a different Appraised Value. The third Qualified Appraiser shall notify Landlord and Tenant of its decision as to the Appraised Value, which shall be final and binding on the parties. Landlord and Tenant shall each be responsible for the costs of expenses of their own Qualified Appraisers and shall each be responsible for one-half of the costs and expenses incurred by the third Qualified Appraiser.

(iii)    *Purchase Price.*  Once the Appraised Value is established pursuant to Section 20(a)(ii), then the Purchase Price shall be the greater of that Appraised Value or the Minimum Price.

(b)    <u>Exercise Periods and Closing Date.</u>  Provided (i) this Lease is in effect, (ii) Tenant is not in default under this Lease, and (iii) the Minor Plat Contingency is satisfied, Tenant may exercise the Option at any time after the Purchase Price has been established but not later than  the date that is one hundred twenty (120) days before the fifth (5th) anniversary of the Commencement Date, by giving written notice to Landlord that Tenant is exercising the Option.  If the Option is not timely and properly exercised, then the Option shall be null and void, but this Lease shall remain in effect.  If the Option is exercised, closing (the "<u>Closing</u>") of the purchase shall occur on a date specified by Tenant in its notice exercising the option, which date may not be sooner than five (5) days before the fifth (5th) anniversary of the Commencement Date and not later than fifteen (15) days after the fifth (5th) anniversary of the Commencement Date.

(c)    <u>Closing Documentation, Prorations and Expenses.</u>

(i)    *Purchase Price.*  If the Option is exercised, then at the Closing Tenant shall pay the Purchase Price to Landlord, by wire transfer of immediately available funds, subject to prorations and expenses set forth in this Section.

(ii)    *Documentation.* Landlord shall convey the Premises at the Closing by recordable special warranty deed of the Premises, free of liens and encumbrances, except (i) real property taxes due and payable in the year of the Closing, (ii) easements, restrictions, and other matters of record, and (iii) zoning laws and regulations affecting the Property.  Landlord shall provide to Tenant evidence reasonably satisfactory to Tenant and its title insurance company of the authority of the person signing documents on behalf of Landlord.  Landlord shall also execute and deliver such other legally required documentation (such a Firpta affidavit and 1099s form) or customarily used documentation (such as seller's affidavit) as may be reasonably requested by Tenant or Tenant's title insurance company, but as to the seller's affidavit appropriately qualified by Landlord's knowledge and as to Landlord's actions only, considering that Tenant is in possession of the Premises.

(iii)    *Expenses and Credits.* Landlord will pay for the transfer tax on the deed, and Tenant will pay all other expenses of the Closing.  Tenant shall be credited with the amount of the Security Deposit held by Landlord as of the date of the Closing and with an amount equal to Monthly Base Rent and Additional Rent paid by Tenant for the month of the Closing that applies to the period after the date of the Closing.  Real property ad valorem taxes will be prorated. Landlord and Tenant shall each pay their own attorney and other professional fees and expenses.

(iv)    *No Commissions on Sale*.  Landlord and Tenant each represent and warrant that neither has had any dealings with any realtor, broker or agent in connection with the sale and purchase of the Premises, except the Brokers identified in Section 1.1(j).  Landlord shall pay a commission to the Brokers pursuant to a separate agreement or agreements. Should any claim for a commission be made by any other broker or agent or other person or entity (including without limitation the Brokers), the party responsible for such claim shall defend, indemnify and hold harmless the other party from and against any claims, demands, damages, losses, costs or expenses (including attorney fees) resulting from the claim.

(d)    Exchange. Landlord and Tenant each has the option to sell and convey, or to purchase and acquire, the Premises as part of a deferred exchange of like kind properties, as contemplated by section 1031 of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder. Landlord and Tenant will cooperate in such exchange so long as the other incurs no additional expense or liability as a result of such cooperation.

Landlord and Tenant have executed this Lease as of the date set forth above, but actually on the dates set forth below.

**LANDLORD**:
211 N ENGLISH STATION, LLC

**TENANT**:
CAIR HEATING AND COOLING LLC

By: _____
       Gabriel J. Molnar, Manager

Date: _____, 2022

By: _____
       Name: _____
       Title: _____
Date: _____, 2022

19

**EXHIBIT A**
Revised Development Plan



PROPOSED OFFICE/WAREHOUSE
211 N. ENGLISH STATION ROAD

**EXHIBIT B**
Work Letter

1.    **Site Improvements**. Landlord, at Landlord's cost, shall make improvements to the Land consistent with the Revised Development Plan, including providing approximately 30 paved parking spaces on Lot 2.

2.    **Building**. Landlord, at Landlord's cost, shall construct the Building in accordance with applicable ADA and state and local life safety codes including providing the following:

Clear Height:                 24' – 20' interior nominal clear height.

Dock Equipment:          Landlord will provide two dock-high doors (9' x 10') complete with bumpers, fiberglass dock shelters and 28,000+ lb., (6' x 8') Rite-Hite® mechanical dock leveler. Two 9'x10' drive-in doors and one oversized drive-in door (12' x 15').

Electrical:                      800-amp service

Floor Slab:                     Floor slab is 5 inches thick poured in place concrete on top of a 6-inch dense grade aggregate compacted crushed stone base. The concrete compression strength exceeds 4000 psi. The Flatness and Levelness tolerance is within 35/FF to 25/FF tolerance.

Fire Protection:             Building is equipped with ESFR sprinkler system, minimum 75 PSI. System will be tied into an alarm company.

Warehouse Lighting:     Latest generation L.E.D. high-bay lighting fixtures at an average of 30 foot-candles.

Roof:                             The roof will be a fully-insulated, Landlord's choice of mechanically-attached TPO roofing system or metal roofing system. It carries a 15-year, no dollar limit warranty.

3.    **Tenant Improvements**.

        (a)    <u>Plans and Specifications</u>. Promptly after the date of this Lease, Landlord in consultation with Tenant shall cause to be prepared and submit to Tenant for Tenant's review Landlord's proposed detailed plans and specifications for Landlord's final design of the interior of the Building, consistent with Tenant's proposed floor plan provided on July 12, 2022 as shown in *Exhibit D*, including: (i) dimensioned layout of all partition walls and electrical connected loads; (ii) location of doors and door swings; (iii) decorating schedule, including doors, door hardware, cabinets, floor finishes, wall treatments, finish and color schedule; (iv) location of electrical outlets; (vi) location of telephone/data rough-in boxes: (vi) reflective ceiling plan, including the location of the light fixtures and switches; (vii) plumbing submission showing 1 fixtures and piping and all connections to Building systems, and schematic diagram of water service within Premises; and (viii) gas service connections; BUT EXPRESSLY EXCLUDING mechanical, heating, air conditioning and ventilations systems and air distribution ductwork plan (the "<u>HVAC</u>"). Within seven (7) days after receipt of the proposed plans and specifications, Tenant will return those plans and specifications to Landlord, either noted approved or with comments and requested changes. If Tenant requests changes and Landlord agrees, Landlord shall make such changes and resubmit the revised plans and specifications for Tenant's approval. If Tenant requests changes and Landlord does not agree, Landlord

21

shall make such changes as it is willing to make and resubmit the revised plans and specifications for Tenant's review and either approval or request for additional changes. This procedure shall continue until Landlord and Tenant agree on final detailed construction plans and specifications (once approved, the "Plans and Specs"). If final Plans and Specs are not finally agreed by a date that is forty-five (45) days after the date of this Lease, then Landlord or Tenant may terminate this Lease by notice to the other; provided, if neither exercises this right to terminate before the Plans and Specs are final, then the right to terminate shall be null and void upon approval of final Plans and Specs. If this Lease is terminated, then Tenant shall reimburse Landlord for Landlord's out-of-pocket costs incurred in connection with preparing preliminary and revised plans and specifications.

(b)  Tenant Improvements. Landlord, at Landlords' cost, shall make the improvements to the Premises according to the Plans and Specs (the "Tenant Improvements"). Landlord shall begin the Tenant Improvements promptly the Plans and Specs are final and agreed and permit(s) for the Tenant Improvements has/have been issued. Landlord shall cause the Tenant Improvements to be performed in a good and workmanlike manner in accordance with the Plans and Specs, and in accordance with applicable federal, state and local laws, ordinances and building codes.

(c)  Changes. Tenant may initiate changes in the Tenant Improvements (each, a "Change Order"). Each Change Order must receive the prior written approval of Landlord, such approval not to be unreasonably withheld or delayed; provided, however, (i) if a Change Order would adversely affect (in the reasonable discretion of Landlord) (A) the structure or systems of the Building, or (B) the exterior appearance of the Building, Landlord may withhold its consent in its sole and absolute discretion. Once approved by Landlord in writing, however, each approved Change Order shall become part of the Plans and Specs and shall be performed by Landlord as part of the Tenant Improvements. Any additional costs due to a Change Order, including a construction management fee, shall be paid by Tenant to Landlord at the time the Change Order is approved.

(d)  Substantially Completed; Tenant Delays. The Tenant Improvements shall be deemed "Substantially Completed" when (a) the Tenant Improvements has been finished in accordance with the Plans and Specs except for minor or insubstantial details of construction, adjustment of equipment and fixtures or finishing touches like touch-up plastering or painting (i.e., the "punch list" items) that can be completed after the Premises are delivered to Tenant without causing interference (other than minor inconvenience) with Tenant's occupancy of the Premises; and (b) a temporary or conditional certificate of occupancy has been issued for the Premises. Notwithstanding the preceding sentence, if Landlord shall be delayed in completing the Tenant Improvements as a result of any act or omission of Tenant or as a result of a Change Order that increases the time to complete the Tenant Improvements (a "Tenant Delay"), then for purposes of determining the Commencement Date, Landlord shall be deemed to have Substantially Completed the Tenant Improvements on the date that Landlord determines in its reasonable judgment that the Tenant Improvements would have been Substantially Completed if such Tenant Delay(s) had not occurred.

4.  **HVAC and Allowance**. Tenant shall install the HVAC at Tenant's cost, but with contribution by Landlord of the Allowance. Tenant shall provide to Landlord its plans and specifications for the HVAC, which are subject to Landlord's approval, not to be unreasonably withheld or delayed. If and once approved, the plans and specs are the "HVAC Specs". If not agreed on by a date that is _____ (___) days after the date of this Lease, then Landlord or Tenant may terminate this Lease by notice to the other; provided, if neither exercises this right to terminate before HVAC Specs are final, then the right to terminate shall be null and void upon approval of final HVAC Specs. Landlord shall provide an allowance in the amount of $ _____ (the "Allowance") to be utilized by Tenant towards the cost of the HVAC. Tenant shall install the HVAC in a good and workmanlike manner in accordance with the HVAC Specs, and in accordance with applicable federal, state and local laws,

22

ordinances and building codes. Once Tenant has finished installing the HVAC, Tenant may present to Landlord a request for payment.  Landlord will pay the request for payment up to but not to exceed the amount of the Allowance when all of the following have occurred:  (a) Landlord has received certification by Tenant and any contract(s) that completion of the HVAC is in accordance with the HVAC Specs; (b) Landlord has inspected the HVAC for compliance with the HVAC Specs (and, to the extent any work does not conform to the HVAC Specs, Tenant has made such corrections as necessary to conform to the HVAC Specs); (c) Tenant has provided to Landlord final lien waivers and affidavits of payment from Tenant's contractor and subcontractors and suppliers providing work or materials in excess of $2,000.00; and (d) Tenant has provided an acceptable inspection report from any governmental or quasi-governmental agency with jurisdiction performing inspections. If any mechanic's lien is filed against the Premises for work or materials furnished to Tenant, the lien shall be discharged or bonded off by Tenant, solely at Tenant's expense, within thirty (30) days after Tenant receives notice thereof; provided, no contractor, subcontractor or supplier shall have any right to place a lien against the fee interest or Landlord's interest in the Premises, and Tenant shall provide notice that no such right against the fee interest or Landlord's interest is available in Tenant's general contract(s) and shall require each general contractor to provide such notice in all subcontracts.

**5.** **Early Occupancy**. Tenant may have early occupancy of the Building to install the HVAC and to begin rack installation and other set-up functions (but not to conduct Tenant's business in the Building) at such time as Landlord determines such activities will not interfered with Landlord's ongoing construction of the Building and the Tenant Improvements (estimated to be approximately two (2) months before the anticipated Commencement Date). During the early occupancy period, Tenant shall coordinate its activities with Landlord so as not to interfere with Landlord's ongoing work.  During such early occupancy period, all provisions of this Lease shall be in effect, including without limitation the provisions of this Lease concerning Tenant's indemnity obligations and obligations to carry liability insurance, except only that Tenant shall not be required to pay Base Rent or Additional Rent until the Commencement Date.

**EXHIBIT C**
Form of Commencement Date Certificate

**COMMENCEMENT DATE CERTIFICATE**


This Certificate is made by and between 211 N ENGLISH STATION, LLC, a Kentucky limited liability company ("Landlord") and CAIR HEATING AND COOLING LLC, a Kentucky limited liability company ("Tenant") with respect to the Lease between Landlord and Tenant for Premises known as 13101 Data Vault Drive, Louisville, Kentucky.

Landlord and Tenant agree as follows:

1. The Commencement Date is _____, 202__.

2. The Expiration Date is _____, 203___.

All terms and conditions of the Lease are hereby ratified and acknowledged to be unchanged and shall remain in full force and effect.

**LANDLORD:**                          **TENANT:**
211 N ENGLISH STATION, LLC             CAIR HEATING AND COOLING LLC


By: _____           By: _____
    Gabriel J. Molnar, Manager             Name: _____
Date: _____, 2022                Title: _____
                                       Date: _____, 202__

**EXHIBIT D**
Proposed Floor Plan



25